## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FAYE R. GREY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 07 C 978 |
| | ) |
| KIRKLAND & ELLIS, LLP, an | ) Judge Rebecca R. Pallmeyer |
| Illinois limited liability partnership, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Plaintiff Faye Grey applied twice for a job with the Chicago law firm Kirkland & Ellis LLP ("Kirkland"), but was turned down. In this lawsuit, Grey, who is African-American, asserts that the firm failed to hire her on account of her race, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C § *2000e et eq.*, and 42 U.S.C. § 1981 ("Section 1981").[1] The position Grey sought involved assisting Kirkland's transition to new word-processing software. Kirkland asserts that Grey's inability to pass a screening exam that tested her familiarity with the software demonstrates that she was not qualified for the position and provides a non-discriminatory basis for Kirkland's decision not to hire her. The court agrees and grants Kirkland's motion for summary judgment.

### BACKGROUND

Grey is a legal secretary with more than 20 years of professional experience. (Pl.'s Stat. of Add'l Facts at ¶ 8.) In June 2004 and again in May 2005, Grey applied to become a "Floor Practice Support Specialist" ("FPSS") at Kirkland. Kirkland created the FPSS position in 2004 to

---

[1] Grey has also joined former Kirkland employees Tammi Bowden and Nancy Gagen in asserting claims against Kirkland based on the firm's alleged surveillance of private telephone calls. The court addresses those claims in a separate companion order. Bowden and Gagen have also separately asserted their own discrimination claims against Kirkland. The court addresses those claims elsewhere as well.

assist with the firm's transition of its computer word-processing software from Word Perfect to Microsoft Word. FPSS job responsibilities included providing expert technical assistance to Kirkland attorneys and staff, converting documents, repairing corrupt documents, and troubleshooting potential software problems. (Pl.'s 56.1 Resp. at ¶ 11.) Grey's application for the job was rejected both times; the second rejection, Grey asserts, was the product of race discrimination. The court recounts the facts in the light most favorable to Plaintiff, as non-movant.

Grey first applied for the FPSS position in June 2004, by e-mailing her resume to Kirkland's secretarial recruiter Deb Moran, who is Caucasian. (*Id.* at ¶ ¶ 5, 13.) Tammi Bowden, a longtime friend of Grey's who already worked at Kirkland as a legal secretary, also applied for the position at or about the same time. (*Id.* at ¶ ¶ 6, 14, 15.) Bowden, who is also African-American, was ultimately hired in lieu of Grey. (*Id.* at ¶ 15.) Grey acknowledges that Bowden was a "highly skilled internal candidate" who was at least as qualified for the position as Grey. (*Id.* at ¶ 15-16.) Grey therefore does not assert any claims based on Kirkland's initial decision to hire Bowden, rather than herself, for the 2004 opening. (Pl.'s Br. at 3, FN 2.)

After being selected to fill the opening, Bowden agreed to notify Grey and to serve as her reference whenever additional FPSS positions opened up at Kirkland. (*Id.* at ¶ 15.) In 2005, Kirkland decided to expand the FPSS program by filling additional six positions and Grey applied again. True to her word, Bowden forwarded Grey's resume to Moran and acted as one of Grey's references. (*Id.* at ¶ 21.) Moran conducted an initial telephone interview with Grey on May 19, 2005, during which Grey stated that she had equal experience working with corporate and litigation documents but that she preferred corporate work. (*Id.* at ¶ 24.) At the close of the phone call, Moran invited Grey to visit the firm's offices on May 24, 2005 so Grey could take a series of screening tests. (*Id.* at ¶ 25.) Those tests, which Kirkland administered to all applicants to test their proficiency with word-processing software, included a typing examination, a proofreading examination, and a Microsoft Word proficiency examination. (*Id.* at ¶ ¶ 12, 18; Pl.'s Stat. of Add'l

Facts at ¶ 2, 4.)  Those applicants who passed the skills tests advanced to a second interview stage. (Pl.'s 56.1 Resp. at ¶ 19.)

There is no dispute that Grey easily exceeded Kirkland's minimum score requirements for the typing and proofreading exams.  Grey failed the third exam, however.  Referred to as the "Word test," that exam tested the applicant's familiarity with Microsoft Word's editing and formatting functions.  Grey does not dispute that she was given a failing grade for the Word test.  (Pl.'s Br. at 1.)  She asserts, however, that the circumstances of the test's administration were sufficiently unfair and suspicious as to give rise to an inference of discrimination.

At the time Grey took the Word test, in May 2005, there were two versions of the exam–one geared toward the formatting of litigation documents and one geared toward the formatting of corporate transactional documents.  (Pl.'s 56.1 Resp. at ¶ 26.)  Both versions of the test appear to have been developed within the Kirkland firm.  Kirkland's Document Services Coordinator Leigh Quinlisk, who is Caucasian, testified that she personally created the litigation version of the test and adapted the corporate version from a test in use at Kirkland's New York office.  (Quinlisk Dep. at 77-87.)  Quinlisk testified that she chose to use these in-house exams because the available commercial exams did not adequately test certain specific Word functions that the law firm regularly used.  (*Id.*)  Both versions of the Word test were scored on an 80-point scale that allotted point values for the successful completion of various formatting functions.  Unlike the typing and proofreading tests, which were machine-scored, the Word exam was scored by hand.  (Pl.'s Stat. of Add'l Facts at ¶¶ 1-3.)  Two different versions of the Word test required the applicants to perform slightly different word-processing functions, but a score of at least 70 points was required to pass either version.  (*Id.* ¶¶ 6-7; Def.'s 56.1 Stat. at ¶ 42.))

All applicants were given a choice as to which version of the Word test they preferred to take, and applicants were advised to choose the area in which their skills were stronger.  (Pl.'s 56.1 Resp. at ¶ 29.)  Grey testified that she voluntarily chose to take the corporate version of the Word

test because she was "very familiar with formatting corporate documents." (Grey Dep. at 44-45.) Applicants taking the corporate version of the exam were given two hours in which to format financial tables, tables of contents, and signature blocks; utilize Word-specific styles; and perform various general formatting functions for a draft securities document. (Pl.'s 56.1 Resp. at ¶ 27; Pl.'s Stat. of Add'l Facts at ¶ 10.) Moran initially administered Grey's test and then sent the test materials to Quinlisk. At Quinlisk's request, Kirkland's Technical Document Specialist Ann Sullivan graded Grey's test. Sullivan gave Grey a failing grade of 61. (Pl.'s Resp. at ¶ 42.) Upon receiving Sullivan's score report, Quinlisk testified, she personally re-graded Grey's test and arrived at the same score of 61. According to Quinlisk, it was common for "a second set of eyes" to review applicants' tests in order to insure against grading errors. (Pl.'s 56.1 Resp. at 43; Quinlisk Dep. at 215, 260-61.) Grey received point deductions, Quinlisk testified, for failing to satisfactorily complete a number of tasks related to fonts, table headings, "dot leaders" in tables, alignment of numbers and dollar signs, text search and replacement, and the running of a "Delta View" document comparison. (*Id.* at 41; Quinlisk Dep. at 262-70.)[2] At the time that Quinlisk graded Grey's test, Quinlisk testified, she did not know what Grey's race was. (Quinlisk Dep. at 502.) Nor was Quinlisk aware of any facts to suggest that Sullivan, who also graded the exams of several other applicants, had any knowledge of Grey's race. (*Id.*)

Grey nevertheless believes that the exam was specifically designed for the purpose of disqualifying her on account of her race. According to Grey, prior to administering the test, Moran told Grey that "[Kirkland] took some of the hardest things we could find and put them together just for you. You're the first person to take this test." (Grey Aff. ¶ 14.) Though Moran does not remember exactly the conversation that she had with Grey, she unequivocally denied making any

---

[2] Quinlisk, not Sullivan, is the source of this information. It does not appear from the record that Sullivan was ever deposed in connection with this lawsuit, and the original score sheet that Sullivan used to grade Grey's exam is not in the record. (Pl.'s Stat. of Add'l Facts at ¶ 20.)

4

such statement: "[A]s an HR professional[,] I would not say we've created this test especially for you. I would not say those words. What I very well could have said was something along the lines of this is a test that we've created specifically for this position. But I would not have said this is a test we've created specifically for you, no, absolutely not." (Moran Dep. 193-95.) In any event, Moran testified, she did not actually know precisely why the Word test was created because she played no role in its creation. (*Id.* at 195.) Quinlisk stated that she opted to use the corporate exam because it tested specific skills that the firm deemed necessary for the corporate FPSS position. (Quinlisk Dep. at 77-87.) At her deposition, Grey admitted that she knew the same test had been administered to "several" other applicants who elected to take the corporate version of the Word exam. (Grey Dep. 68-69; Pl.'s 56.1 Resp. at ¶ 66.) One of those applicants was Grey's friend Tammi Bowden, who passed the same test in 2004 and had positive things to say about the Word test. After taking the exam, Bowden told Quinlisk that she believed the test to be "one of the best, if not the best [skills test] I've taken in my too-many-years-to-mention legal career." (Pl.'s Resp. at ¶ 63; Quinlisk Dep. at 539-40.)

Another applicant who took the corporate version of the Word test was Angelia Starks, an African-American woman who was ultimately hired by Kirkland to fill the corporate FPSS position that Grey sought. (Pl.'s Stat. of Add'l Facts at ¶ 38; Quinlisk Dep. at 330-35.) Starks took the test in August 2005 and scored a 65, four points better than Grey but still five points short of a passing grade of 70. (Pl.'s Resp. at ¶ 58.) Quinlisk testified that Kirkland decided to hire Starks in spite of her low score because, by August 2005, the firm had become concerned that it was not attracting enough candidates who were capable of obtaining a score of 70 on the corporate version of the exam. (Quinlisk Dep. at 508.) The firm also filled five FPSS positions in the firm's litigation practice between August 2005 and October 2005. (Pl.'s Resp. at ¶ 53.) Of the successful litigation applicants, one was African-American and one was Hispanic. (*Id.*) Some time later, the firm hired an additional FPSS candidate, Lisa Brown, who is African-American. (*Id.*)

In August 2005, Kirkland hired Laura Phillips, who is Caucasian, to fill an FPSS position in the firm's Intellectual Property practice. (Pl.'s Stat. of Add'l Facts at ¶ 32.) Grey asserts that she was more qualified to be an FPSS than Phillips. In support, she points to score sheets bearing Phillips's name, which show that Phillips did not score as well as Grey on the proofreading or typing exams. (*Id.* at ¶ 33-34.) The score report for Phillips's Word test—the same corporate version, Grey claims, that Grey took—shows that Phillips initially earned a score of 67. (*Id.* at ¶ 35-36.) The number 67 is typewritten at the bottom of the score report, but a handwritten line is drawn through that number and the number 70 has been hand-printed below it. (*Id.* at 36.) It is not clear why Phillips's score may have been changed, as neither Phillips nor whoever scored her exam were deposed in this case. Nor does it appear that Phillips's score sheets were ever properly authenticated by affidavit or testimony.

After taking the exam, Grey testified, she did not hear anything from Kirkland for five or six weeks. (Grey Dep. at 57-58.)[3] Moran ultimately contacted Grey in July 2005 to inform her that she had failed the Word exam and would not be hired. In an e-mail response sent on July 7, 2005, Grey asked whether she was eligible to take the litigation version of the Word proficiency test. Moran immediately forwarded this request to Quinlisk and Amos, seeking guidance on how to respond. (Moran Dep. 235-38). Grey has produced the record of an e-mail exchange that took place between Quinlisk and Amos following the forwarding of Grey's request. (Ex. 23 to Quinlisk Dep.) In the exchange, Quinlisk writes: "This is amazing!!! It sounds like Tammi [Bowden] typed it herself! [Grey] did not pass the test. That does not mean she gets to take the other test in the hopes of passing that one. It was her choice to take the corporate test. What a joke." (*Id.*; Quinlisk Dep. at 302-09.) Grey believes that Quinlisk's reference to Bowden reflects an awareness that Bowden, whose race was known to Quinlisk, had referred Grey. There is no evidence that any FPSS

---

[3] Moran testified that she was away from the office on vacation during at least part of that time. (Moran Dep. 305-06.)

applicants, whatever their race, were ever allowed to retake an exam or to take a different version of an exam they initially failed. (Pl.'s 56.1 Resp. at ¶ ¶ 28, 48, 71.) Moran ultimately informed Grey that she would not be eligible to retake the exam, but Moran indicated that she intended to keep Grey's resume "on file."

Grey asserts that Kirkland's refusal to allow her to take the litigation version of the Word test is unfair because the corporate version of the test was considerably more difficult than the litigation version. Kirkland acknowledges that it revised the Word test in September 2005, four months after Grey took the exam. An internal memorandum, signed by Kirkland's Human Resources Manager Mary McMahon and dated August 30, 2005, states, in part: "The candidate pool/talent is not great, and we are not seeing strong resumes or resumes that fit the position specifications . . . To date, only 2 candidates out of 11 have passed the [Word proficiency] test. The Litigation test appears easier than Corporate test." (Ex. 14 to Moran's Dep., at 1-2.) Specifically, McMahon observed, applicants who took the corporate test were asked to perform more challenging formatting tasks and generally took significantly longer to complete the exam. (*Id.*) McMahon concluded her memo by suggesting that Moran and Quinlisk "work together to modify the current test." (*Id.*)[4]

There is no evidence that African-American applicants scored lower on the Word proficiency test than did white applicants, and Kirkland's Secretarial Services Manager Dawn Amos testified that African-Americans were not steered toward one version of the test of the other. (Pl.'s Resp. at ¶ 64-65; Amos Dep. at 533.) Indeed, Grey testified that she voluntarily chose the corporate test.

Moran, Quinlisk, and Amos disagreed with McMahon's characterization of the corporate test as more difficult than the litigation test, but they admit that Kirkland did ultimately revise the Word test. (Moran Dep. 246-47, Quinlisk Dep. 325-26; Amos Dep. 235-37.) In September 2005, Kirkland Technical Document Specialist Christine Rampich combined the then-existing litigation and

---

[4] It does not appear from the record that McMahon was deposed in connection with this litigation.

corporate versions of the Word test into a single revised exam. (Rampich Dep. at 80-85.) Kirkland never contacted Grey to invite her to retest using the revised exam.

Grey also asserts her test was not graded accurately. (Pl.'s Br. at 1.) Specifically, four points were deducted from Grey's exam for failure to run and save a Delta View comparison,[5] but Grey insists that she did run the comparison. (Grey Dep. 56-57.) Grey testified that she remembered using the Delta View function because she specifically asked Moran for assistance in finding the correct icon on the computer screen for this purpose.[6] (*Id.*) Moran suggested that it was possible Grey did not receive credit for the Delta View comparison because she had saved the comparison in the wrong computer directory. (Moran Dep. at 186, 214-15.) Whether this in fact explains the loss of four points from Grey's score is not clear. Grey also complains that she should have been granted partial credit for a few tasks that she completed in part. These supposed inaccuracies and inequities, Grey asserts, give cause to "question the accuracy" of Kirkland's testing system. (Pl.'s Br. at 14, FN 5.)

## DISCUSSION

On summary judgment, the court credits the evidence offered by the non-movant and draws all justified inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is only proper if the pleadings, the discovery and disclosure materials on file, and the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). In order to avoid summary judgment, the non-movant must come forward with

---

[5] The Delta View function of Microsoft Word allows a user to track changes in a given document by comparing two versions of the document and highlighting differences. It is regularly used in transactional legal practice to compare different versions of documents, such as contracts.

[6] Kirkland does not raise the point, but it seems that the mere fact that Grey was forced to seek Moran's assistance to find the right icon demonstrates that Grey was somewhat unfamiliar with the word-processing program.

specific facts showing a genuine issue for trial and produce sufficient evidence to permit a jury to return a verdict in her favor.  *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (2008); *Karazanos v. Navistar Intern. Transp. Corp.*, 948 F.2d 332, 337 (1991) ("[A] plaintiff's speculation in not a sufficient defense to a summary judgment motion.")

In this case, Grey claims that Kirkland failed to hire her on account of her race, in violation of Title VII and Section 1981.  The same standards apply under both statutes.  *See, e.g., Bennett v. Roberts*, 295 F.3d 687, 697 (7th Cir. 2002).  Grey may attempt to establish her claim in either of two ways.  First, under what is typically called the "direct method," she may present direct or circumstantial evidence that creates a "convincing mosaic of discrimination" on the basis of race. *See Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir.1994); *Winsley v. Cook County*, 563 F.3d 598, 604 (7th Cir. 2009).  Second, under the "indirect method," she may establish a prima facie case of discrimination by presenting evidence that: (1) she is a member of a protected class, (2) she was qualified for an open position for which she applied, (3) her application for employment was rejected, and (4) the employer filled the position with someone not of claimant's protected class, or left the position open.  *Blise v. Antaramian,* 409 F.3d 861, 866 (7th Cir. 2005); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  As explained below, the court concludes Grey has failed to establish her claim under either analysis.

**Grey's Evidence Under the Direct Method**

Like most plaintiffs, Grey lacks "direct evidence" of discrimination, that is "an admission by the decision-maker that his actions were based on prohibited animus," *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003) (citation omitted).  She contends, however, that circumstantial evidence establishes a "convincing mosaic"—indeed, in her view, a "damning mosaic"—from which a jury could "infer intentional discrimination by the decisionmaker."  (Pl.'s Br. at 6); *see Rhodes v.*

9

*Illinois Dept. of Transp.* 359 F.3d 498, 504 (7th Cir. 2004) (citing *Troupe*, 20 F.3d at 737.)[7] In the court's view, however, Grey has considerably overstated her case. The circumstantial evidence she points to, in aggregate, does not "point directly to a discriminatory reason for [Kirkland's] action." *Rhodes,* 359 F.3d at 504 (citing *Adams v. Wal-Mart Stores*, Inc., 324 F.3d 935, 939 (7th Cir. 2003)).

Grey complains that the corporate exam she took was unduly difficult, that Kirkland's grading method was inaccurate, and that the firm's refusal to allow her to take the test again was unfair. Anti-discrimination laws do not protect plaintiffs against employer policies that are "unwise or even unfair," however; they protect only against adverse actions that are motivated by impermissible *discrimination*. *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006). As the Seventh Circuit has repeatedly stressed, courts "'do not sit as a superpersonnel department' where disappointed applicants or employees can have the merits of an employer's decision replayed to determine best business practices." *Blise*, 409 F.3d at 867 (quoting *Holmes v. Potter*, 384 F.3d 356, 361-62 (7th Cir. 2004)). Even assuming that Kirkland's testing procedure was indeed "deeply flawed," as Grey claims, the evidence does not link such flaws to any discriminatory animus on Kirkland's part. (Pl.'s Br. at 9.)

For example, Grey asserts that the corporate version of the Word test was significantly harder than the litigation version. This fact, assuming it is true, however, does not support a reasonable inference that the discrepancy is a product of race discrimination. Amos testified (and

---

[7] As *Troupe* recognized, there are typically three types of circumstantial evidence in a discrimination case: (1) suspicious timing, ambiguous statements or behaviors, or "other bits and pieces" of evidence supporting an inference of discrimination; (2) evidence, whether or not rigorously statistical, that similarly-situated employees who were not of the protected group received systematically better treatment; and (3) evidence that the plaintiff was qualified for the job in question but passed over in favor of a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief. *Troupe*, 20 F.3d at 736. This third type of circumstantial evidence is often confusingly similar to the "indirect method" of proof. *See Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 762 (7th Cir. 2001).

Grey does not dispute) that job applicants were not led or directed to take one version of the exam or the other on account of their race. Grey herself independently chose to take the corporate exam because she was more familiar with corporate documents. Nor does Grey suggest that the discrepancies in the various versions of the test had a disparate impact on African-Americans: she acknowledges that she has no evidence that African-American applicants scored lower than Caucasian applicants on either version of the Word test. Thus, Grey's evidence regarding the difficulty of the corporate exam supports neither the inference that the exam was imposed in a discriminatory manner nor the inference that the exam had as its consequence the exclusion of African-American applicants from consideration. All of Grey's circumstantial evidence shares this same weakness; it simply does not point to race discrimination as the basis for Kirkland's decision not to hire her.

Grey's insinuation that Kirkland tailored the exam specifically to prevent her from gaining employment is unsupported by the record and belied by the undisputed facts. Grey admits that the same test she complains of was administered to all FPSS applicants who elected to take the corporate exam, without regard to their race. Tammi Bowden and Angelia Starks–who are both African-American–took the same exam, scored higher than Grey, and were hired for employment by Kirkland. The fact that Kirkland twice hired African-American applicants instead of Grey to fill the very same position that Grey sought rebuts any inference that Kirkland's hiring decisions were motivated by racial animus. *See, e.g., Garcia v. Henry Street Settlement*, 501 F. Supp.2d 531, 543 (S.D.N.Y. 2007) (collecting cases).

Grey's testimony that Moran said the test was created "just for [Grey]" does not raise a material dispute of fact on this issue. Moran denies making such a statement and the undisputed evidence confirms that, whatever Moran may have said at the time, the test was not created specifically for Grey. At her deposition, Moran testified that she did not create the exam and thus could not know whether it was created "just for [Grey]." Quinlisk, who was actually responsible for

implementing the corporate exam, testified that she selected the exam because it tested skills she deemed necessary for the corporate FPSS position. Grey offers no evidence to rebut this testimony.[8]

The other "bits and pieces" of evidence that Grey offers similarly fail to coalesce into a convincing mosaic. *Troupe*, 20 F.3d at 736. Grey sees particular malevolence in "Quinlisk's flippant dismissal of Grey's request to take the litigation version" of the Word test, but the court is not satisfied that Quinlisk's comments reflect race bias. (Pl.'s Br. at 6.) Quinlisk's statement—"It sounds like Tammi [Bowden] typed it herself . . . What a joke."—is ambiguous and facially race-neutral. It may be reasonably interpreted as simply a reference to Bowden and Grey having a similar style of writing (or a similar habit of persistence). On its face, this "flippant dismissal" expresses little more than a sense of incredulity at Grey's request, rather than any discriminatory animus. Nor is the court moved by the fact that Kirkland did not invite Grey, who had already turned in a sub-par Word test performance, to reapply for the position. Grey concedes that no applicant, regardless of race, was ever invited to reapply or retest for the FPSS position after failing a screening test. In effect, the second chance that Grey sought was preferential treatment. Kirkland did not discriminate against Grey by denying this request.

Grey also complains of the "suspicious" delay in Kirkland's reporting of her test results, but again there is no evidence to suggest that this delay is attributable to discrimination. Moran has offered an innocuous explanation: she was on vacation for at least part of the delay. More

---

[8] In further support of her assertion that she was singled out, Grey points to the fact that Kirkland ultimately lowered its scoring requirements and modified the Word test. This evidence, however, does not give rise to an inference that Grey's application was deliberately targeted for rejection. Grey interviewed for the FPSS opening in May 2005. Four months later, Kirkland determined that it was having difficulty attracting qualified candidates to the post and altered its screening and testing processes. It is undisputed that minority applicants were hired both before and after the Word test was revised, and Grey does not allege that changes in the testing process coincided with any preferential treatment for contemporaneous applicants of different races. Put simply, Kirkland's change in policy does not implicate a discriminatory motive.

importantly, the record does not contain evidence that non-African-American applicants were informed of their test results any faster than Grey was. Nor is there evidence that Moran's delay contributed to Grey's not getting the job. To the contrary, Kirkland was still seeking qualified applicants for months after it rejected Grey's application. Similarly, Grey's complaints about isolated errors in the scoring process do not create an inference of discrimination. The record evidence is that neither Quinlisk nor Sullivan knew of Grey's race at the time that they graded her exam, and there is no evidence to suggest that Kirkland deliberately or consistently underscored the tests of any African-American applicants. In the absence of any evidence that Kirkland deliberately deducted points from Grey's test because she was African-American, this court will not express any views on the exam grading process.

Grey presents no direct evidence and her circumstantial evidence is insufficient to create a convincing mosaic of racial discrimination. She has, thus, failed to establish her claim under the direct method of proof.

**Grey's Prima Facie Case Under the Indirect Method**

Grey's claim fares no better under the *McDonnell Douglass* indirect method because she is unable to establish an essential element of her *prima facie* case: that she was qualified for the FPSS position she sought. Grey is indisputably an experienced legal secretary and typist. She has worked for over 20 years in those functions, and her proofreading and typing scores demonstrate that she possesses considerable skill in those areas. The undisputed evidence, however, is that Kirkland sought more than typing and proofreading skills when it selected qualified FPSS applicants. In addition to those abilities, the firm also required that applicants demonstrate an expert technical familiarity with Microsoft Word software. It was Kirkland's lawful prerogative to impose such a requirement. Courts "do not tell employers what the requirements for a job must be." *Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 765 (7th Cir. 2001). It is undisputed that Grey failed the test that Kirkland used to assess her technical familiarity with the software. Grey

therefore failed to meet Kirkland's legitimate hiring criteria. *See, e.g., Hefley v. Village of Calumet Park*, 239 Fed. Appx. 276, 278 (7th Cir 2007) (employee who failed a mandatory certification test was not meeting employer's legitimate expectations).

Grey contends that Kirkland's explanation for its decision not to hire her is pretextual because, in Grey's estimation, a passing grade on the Word test was not, in fact, a genuine requirement for the FPSS position. Grey notes that Kirkland hired two applicants, Angelia Starks and Laura Phillips, whose scores on the Word exam were lower than 70. As stated above, both Starks and Phillips scored higher than Grey; Starks's score is reported as 65, and Phillips's score is alternately reported as either 67 or 70. Starks's and Phillips's higher scores obviously do not support the notion that Grey was "clearly better qualified for the position at issue." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1179 (7th Cir. 2002) (quoting *Deines v. Texas Dept. of Protective and Regulatory Services*, 164 F.3d 277, 279 (5th Cir. 1999). Kirkland's hiring of Starks and Phillips demonstrates that the firm did not strictly abide by its stated 70-point threshold requirement for the duration of the FPSS hiring process. As Kirkland explains, however, by late August 2005, when Starks and Phillips interviewed for the FPSS position, Kirkland had grown concerned that it was not attracting enough qualified applicants and had adjusted its hiring criteria accordingly. "What the qualifications for a position are, even if those qualifications change, is a business decision" that courts will not ordinarily review. *Gorence*, 242 F.3d at 765 (citing *Dale v. Chicago Tribune Co.*, 797 F.2d 458 (7th Cir. 1986)). Grey's suggestion that Kirkland's decision to reduce the passing score reflects race animus makes little sense given that Starks, one of the applicants who benefitted from the lower score requirements, is also African-American.

Grey admits that, other than the reported test scores, she has no knowledge of the successful applicants' credentials or qualifications. (Pl.'s 56.1 Resp. ¶ 56-57; Pl,'s Stat. of Add'l Facts ¶ 35-40.) And the record is unambiguous that no applicant who scored worse than Grey on

14

the Word exam was hired as an FPSS. (*Id.*)[9] Given this evidence, Grey is unable to prove that she met Kirkland's legitimate employment requirements. Nor can she prove that she was similarly or more qualified than any applicant who was ultimately hired for the job. Thus, Grey has failed to demonstrate her *prima facie* case for discrimination. Her claim cannot survive summary judgment.

## CONCLUSION

Defendant's motion for summary judgment [94] is granted.

ENTER:

Dated: September 2, 2010

_____
REBECCA R. PALLMEYER
United States District Judge

---

[9] Grey asserts that her test was graded inaccurately and, as a result her score was reported to be lower than it should have been. Specifically, she claims that she should have been credited with four additional points for running a Delta View comparison that Kirkland erroneously asserts she failed to run. Assuming that four points were deducted from Grey's score in error, there is no evidence to support an inference that the error was intentional at all, let alone the product of discrimination. Moreover, had Grey received the four points (and a score of 65), she would still have fallen five points short of Kirkland's 70-point passing threshold and at least two points short of Phillips's score.